IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JACK A. PRUITT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 12 C 7849 |
| v. | ) | |
| | ) | Magistrate Judge Michael T. Mason |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security,[1] | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Michael T. Mason, United States Magistrate Judge:

Claimant, Jack A. Pruitt ("Pruitt" or "claimant"), has brought a motion for

summary judgment [12] seeking judicial review of the final decision of the

Commissioner of Social Security (the "Commissioner"). The Commissioner denied

Pruitt's applications for Disability Insurance Benefits ("DIB") and Supplemental Security

Income ("SSI") under the Social Security Act (the "Act"), 42 U.S.C. §§ 416(i), 423(d),

and 1382c(a)(3)(A). The Commissioner has filed a cross-motion for summary judgment

[19] asking the court to uphold the previous decision.[2] The court has jurisdiction to hear

this matter pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons set forth

below, claimant's motion for summary judgment is denied, the Commissioner's motion

for summary judgment is granted, and the Commissioner's previous decision denying

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is substituted for Commissioner Michael J. Astrue as defendant in this suit.

[2] Claimant was given two opportunities to file a reply in support of his motion [18, 21], but chose not to do so.

benefits is affirmed.

I.    **BACKGROUND**

    A.    **Procedural History**

Pruitt filed for DIB and SSI on April 7, 2010 alleging disability beginning April 30,

2006 due to breathing and heart problems, a learning disability, mood swings, bipolar

disorder, leg problems, diabetes, and high cholesterol. (R. 95, 176-84.) His claims

were denied initially on November 8, 2010 and upon reconsideration on February 15,

2011. (R. 95-99, 106-110, 114-17.) Thereafter, the claimant filed a timely request for

an administrative hearing. (R. 118.) The hearing was held on October 12, 2011 before

Administrative Law Judge ("ALJ") Kimberly S. Cromer. In addition to testimony from the

claimant, the ALJ heard testimony from medical expert Dr. Bernard Stevens and

vocational expert James Breen. (R. 45-90.)

On November 21, 2011, ALJ Cromer issued a written decision finding that Pruitt

was not disabled under the Act. (R. 26-39.) Pruitt filed a timely request for review with

the Appeals Council, which was denied on July 27, 2012. (R. 1-6.) The ALJ's decision

then became the final decision of the Commissioner. This action followed. The parties

subsequently consented to the jurisdiction of this court pursuant to 28 U.S.C. § 636(c)

[7].

    B.    **Medical Evidence**

        1.    **Treating Physicians**

Among other things, Pruitt's medical records reveal treatment for headaches,

chest pain, back pain, and depression. As an initial matter, we note that although the

record reveals that Pruitt repeatedly told physicians that he suffered from four myocardial infarctions (or heart attacks), as well as a stroke, the record does not include specific records regarding those incidents.

Pruitt was admitted to Rush-Copley Medical Center on February 19, 2007 complaining of chest pain with some radiation to his neck and back and associated dizziness. (R. 290.) He described the pain as similar to that which he suffered when he was diagnosed with a heart attack in 2003. (*Id.*) Pruitt claimed he had not followed up following the 2003 incident and ceased taking his medications. (*Id.*) A history of hypertension, angina, asthma, bronchitis, heavy tobacco use, and depression were noted. (*Id.*) A physical examination revealed essentially unremarkable results. (*Id.*) An electrocardiogram ("EKG") showed increased sinus rhythm in V4-V6. (*Id.*) However, the results of an echocardiogram were normal. (R. 288.) A chest x-ray also revealed normal results. (R. 298.)

Pruitt was discharged on February 20, 2007 after a myocardial infarction was ruled out, and was directed to return the next day for a stress test. (R. 292.) During that test, Pruitt became dizzy and was taken to the emergency room. (*Id.*) A second EKG again revealed increased sinus rhythm in V4-V6. (*Id.*) His head CT was normal. (R. 302.) Following a normal cardiac catheterization on February 22, 2007, the examining physician stated "we did not find any significant obstructive disease to explain [Pruitt's] chest pain. Other causes for his chest pain should be looked into. His risk factor of hypertension should be treated." (R. 294.)

On February 23, 2007, Pruitt presented to Good Samaritan Hospital with

3

continued chest and back pain after Rush-Copley told him "there was nothing that could be done for him." (R. 320.) The examining physician noted diffuse wheezing and tenderness on palpation of the right parasternal muscle, but found no other abnormal results upon physical examination. (R. 320-21.) The doctor reviewed and noted the normal cardiac catheterization and CT scan from Pruitt's recent visit to Rush-Copley. (R. 321.) Pruitt was discharged to home with "acute chest/back pain" and advised to take acetaminophen with codeine. (R. 326.)

On November 21, 2007, Pruitt returned to Good Samaritan Hospital for chest discomfort. (R. 309.) Pruitt stated that he was admitted to Mercy Hospital the day before, had an abnormal stress test, but was then told by the cardiologist that the test was normal. (R. 309, 313.) The physical exam at Good Samaritan revealed primarily normal results. (R. 310-11.) A CT scan was negative. (R. 311.) The physician noted that "there has been no documented coronary artery disease in this patient." (R. 309.) As for the abnormal stress test at Mercy, the physician opined that the test was likely "misinterpreted and then corrected." (R. 311.) Pruitt was diagnosed with acute chest pain of a "noncardiac origin," and epigastric pain with probable reflux. (R. 317.) He was advised to take protonix and follow up with a family physician. (*Id.*)

The medical record is silent until Pruitt presented to Aunt Martha's Health Center on January 8, 2010 complaining of vision problems and headaches. (R. 335.) On February 18, 2010, he underwent a psychiatric evaluation at Aunt Martha's during which he reported a history of bipolar disorder. (R. 332.) He was previously seeing a psychiatrist, but stopped doing so after he lost his job. (*Id.*) Pruitt described a history of four heart attacks and a stroke. (*Id.*) The examining physician noted symptoms of

4

depression and bipolar disorder and prescribed Celexa. (R. 333-34.)

On March 25, 2010, Pruitt returned to Aunt Martha's with increased depressive feelings and irritability, though he was tolerating Celexa. (R. 329.) Swelling in his feet was noted and he explained that he only sleeps in a recliner. (*Id.*) On May 18, 2010, Pruitt exhibited wheezing and shortness of breath, which the examining physician opined was "mild intermittent asthma vs. COPD." (R. 328.) The physician recommended albuterol and a nebulizer treatment. (*Id.*)

Also on May 18, 2010, the physician from Aunt Martha's submitted a report to the State of Illinois Department of Human Services regarding Pruitt's condition. (R. 569-72.) The physician indicated his diagnoses as coronary artery disease, bipolar disorder, hypertension, high cholesterol, and chronic back pain. (R. 569.) He noted Pruitt's complaints of chest pain, shortness of breath, and back pain. (R. 570.) According to the Aunt Martha's physician, Pruitt had 20-50% reduced capacity in his ability to walk, bend, stand, stoop, turn, climb, push, and pull. (R. 572.) He found a 20% reduced capacity in his ability to sit, his finger dexterity, and his fine manipulation. (*Id.*) He also noted that Pruitt could lift no more than twenty pounds at a time with frequent lifting of up to ten pounds. (*Id.*)

On May 19, 2010, Pruitt went to Provena Mercy Medical Center ("Mercy") complaining of a headache mostly in the left occipital area. (R. 337.) Dr. Muhammad Siddiq performed a consultative examination and assessed a history of depression, anxiety, and angina. (*Id.*) Dr. Siddiq reported that a chest x-ray, head CT, and EKG were negative, and that he found no abnormal findings on examination. (R. 337-38, 340-42.) Despite Pruitt's complaints of swollen legs, Dr. Siddiq found his legs to be

5

"completely normal without any evidence of any swelling or edema." (R. 339.) Dr. Siddiq recommended gabapentin and that Pruitt follow-up with a pain clinic. (R. 337.)

It appears that Pruitt was discharged on May 21, 2010, but returned that same day when his headache returned. (R. 390.) Another CT exam was ordered, which revealed normal results other than paranasal sinus disease. (R. 393.) Pruitt was given vicodin and discharged. (R. 392.)

Pruitt again returned to Mercy on June 10, 2010 complaining of a headache and chest pain. (R. 371.) Chest imaging revealed no acute cardiopulmonary abnormalities or disease. (R. 364-65.) An EKG showed normal sinus rhythm. (R. 376.) A month later, Pruitt was back at Mercy with chest pain and shortness of breath, unresolved with nitroglycerin or nebulizer. (R. 346, 351.) He exhibited wheezing on examination. (R. 352.) His EKG and chest imaging were again normal. (R. 360, 363.) It appears Pruitt refused further treatment and was not admitted to Mercy. (R. 357.)

On July 11, 2010, Pruitt presented to Rush-Copley with chest pain radiating to the back, and shortness of breath. (R. 398.) Pruitt again stated that he had suffered four heart attacks, the first one being in 2008. (R. 399.) He also stated that he suffered a stroke in 2009. (*Id.*) A physical examination by Dr. Natalie Choi showed audible wheezing, no edema, and full muscle strength in all extremities. (R. 401.) An EKG and chest x-ray were normal. (*Id.*) Dr. Choi assessed "chest pain, atypical. Possibly concerning for cardiac origin as patient may be diabetic." (*Id.*) However, she suspected that the primary cause of Pruitt's chest pain was related to his asthma. (*Id.*) Pruitt was admitted to "rule out myocardial infarction" and a possible stress test. (*Id.*) An echocardiogram on July 13, 2010 showed no significant functional or structural

6

abnormalities. (R. 403-04.) An MRI showed no disc herniation or stenosis. (R. 435.)

On July 20, 2010, Pruitt returned to Rush-Copley due to increasing shortness of breath with associated chest pain. (R. 411.) Pruitt was seen by the cardiology department. (R. 415-19.) After reviewing recent testing and normal stress test results, the cardiac department determined that Pruitt suffered from "atypical likely non-cardiac chest pain" and he was discharged to home with a diagnosis of chronic obstructive pulmonary disease exacerbation. (R. 419-21.)

On August 10, 2010, Pruitt presented to Rush-Copley with continuing chest and back pain, and shortness of breath. (R. 422.) Pruitt was again referred for a cardiology consult, which resulted in no significant findings other than wheezing and sinus tachycardia. (R. 426-30.) The examining physician indicated that no further cardiac work-up was needed at that time. (R. 426.)

Pruitt went to Aunt Martha's for a psychiatric evaluation on January 6, 2011. (R. 565.) He was prescribed depakote. (R. 567.) Pruitt returned to Aunt Martha's on March 12, 2011 and September 9, 2011 for regular check-ups regarding his physical problems and medication management. (R. 562-64.)

On August 3, 2011, Pruitt was taken to Rush-Copley by ambulance for chest pain and discomfort. (R. 521.) Wheezing and edema in the legs were noted upon physical examination. (R. 536.) A cardiac consultation revealed no evidence of a myocardial infarction and a negative stress test for ischemia. (R. 551.) No further cardiac work-up was necessary. (Id.)

**2.   Consultative Physicians**

7

Pruitt underwent a psychiatric evaluation on August 31, 2010 with Dr. Joseph Nemeth. (R. 455-56.) Dr. Nemeth described Pruitt as unkempt, ill groomed, and depressed in appearance, with some pressured speech. (*Id.*) Pruitt reported sadness, mood swings, morbid thoughts, irritability, insomnia, variable appetite, and poor concentration. (R. 456.) He also reported a history of myocardial infarction and general heart disease. (R. 455.) The results of the mental status examination were primarily normal. (R. 456.) Dr. Nemeth assessed major depressive disorder, learning disabilities of the reading and writing type, and cardiovascular problems by claimant history. (*Id.*)

On September 15, 2010, Lionel Hudspeth attempted to complete a Psychiatric Review Technique, but concluded there was insufficient evidence to assess any medical dispositions or functional limitations. (R. 457-70.)

Pruitt underwent pulmonary function testing on October 7, 2010. That testing showed a moderately severe obstruction premed, but significant improvement post med. (R. 472.) The consulting physician noted that Pruitt was not on oxygen, but uses a breathing machine and inhaler. (*Id.*)

On October 21, 2010, Dr. Reynaldo Gotanco completed a Physical Residual Functional Capacity ("RFC") Assessment. (R. 481-88.) According to Dr. Gotanco, Pruitt can occasionally lift and/or carry twenty pounds, frequently ten pounds; can stand and/or walk for at least two hours in an eight hour day; can sit for six hours in an eight hour day; and has unlimited pushing and pulling capabilities. (R. 482.) He found no postural, manipulative, visual, or communicative limitations. (R. 483-85.) As for environmental limitations, Dr. Gotanco concluded that Pruitt must avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation due to his asthma. (R.

485.)

Dr. Terry Travis completed a Psychiatric Review Technique and a Mental RFC Assessment on January 6, 2011. (R. 489-506.) Dr. Travis noted a learning disability, major depressive disorder, and substance abuse. (R. 490-97.) He found Pruitt moderately limited in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace, but found no evidence of any episodes of decompensation. (R. 499.) More specifically, in the Mental RFC assessment, Dr. Travis found Pruitt moderately limited in his ability to understand and remember detailed instructions, to carry out detailed instructions, and to maintain attention and concentration for extended periods. (R. 503.) In all other categories, Dr. Travis found no significant limitations or no evidence of any limitations. (R. 503-04.) In reaching his conclusions, Dr. Travis noted Pruitt's "MSE is consistently essentially normal" and that the activities of daily living report indicated that most of his limitations are physical as opposed to mental. (R. 505.)

Pruitt underwent a consultative examination with Dr. Ravikiran Tamragouri on January 28, 2011. (R. 507-11.) Pruitt again described a history of four heart attacks and a stroke. (R. 507.) He complained of random chest pains, difficulty breathing, and coughing spells, and explained that he sleeps in a recliner because he cannot lay flat. (*Id.*) He reported a history of childhood asthma and a history of excessive tobacco use. (*Id.*)

Upon physical examination, Dr. Tamragouri found that Pruitt exhibited a full range of motion and a normal gait, but did note two plus edema of the legs. (R. 508-09.) Dr. Tamragouri also noted prolonged expiration, but otherwise normal breath

9

sounds. (R. 508.) All other findings were essentially normal. (*Id.*) Dr. Tamragouri assessed a history of possible coronary artery disease and chronic obstructive lung disease possibly related to smoking and a childhood history of asthma. (R. 510.)

On February 14, 2011, Dr. Bharati Jhaveri completed a second RFC Assessment. (R. 512-19.) Dr. Jhaveri concluded that Pruitt can occasionally lift and/or carry fifty pounds, frequently twenty-five pounds; can stand and/or walk for six hours in an eight hour day; can sit for six hours in an eight hour day; and has unlimited pushing and pulling capabilities. (R. 513.) Dr. Jhaveri found no postural, manipulative, visual, or communicative limitations. (R. 514-16.) As for environmental limitations, Dr. Jhaveri agreed that Pruitt must avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation due to COPD. (R. 516.)

## C.    Medical Expert's Testimony

Medical expert ("ME") Dr. Bernard Stevens testified at the administrative hearing. The ALJ first asked the ME to identify Pruitt's medically determinable impairments. (R. 51-52.) The ME testified that Pruitt suffers from COPD and asthma, leg edema of an unknown origin, and obesity. (R. 52.) He stated that "the record doesn't establish that [Pruitt] has coronary artery disease." (*Id.*) In support of his conclusion, the ME relied on the normal angiogram results from 2007 and a lack of any neurological deficit following Pruitt's purported cardiovascular accident. (*Id.*)

Next, the ALJ asked the ME whether Pruitt's impairments meet or medically equal any of Listings. (R. 52.) ME Stevens responded that they did not. (*Id.*) Specifically, he explained that Pruitt would not meet Listing 3.02 for chronic pulmonary

insufficiency because his pulmonary function testing yielded normal results for his height and weight. (R. 52-53.)

ME Stevens did opine that Pruitt would be limited to sedentary work due to his leg edema. (R. 53.) According to ME Stevens, Pruitt would be restricted to only occasionally climbing ramps and stairs, balancing, stooping, kneeling, crouching, and crawling, and could never climb ladders or scaffolds. (R. 53-54.) ME Stevens stated that Pruitt must also avoid concentrated exposure to temperature changes and extremes, humidity, and pollutants. (R. 54.)

The ME then reiterated the lack of medical records regarding Pruitt's allegations of heart problems. He testified as to the "fairly good" cardiac work-up at Rush Copley in August 2011, including the negative chemical stress test and the relatively normal echocardiogram, which revealed a normal injection fracture and did not show any right ventricular impairments. (R. 54.) The ME also found no evidence of a myocardial infarction in 2008, which claimant referred to in his brief to the ALJ. (*Id.*) The ME explained that the abnormal EKG in 2007, which showed V4-V6 and non-specific ST changes, was not indicative of myocardial infarction. (R. 55.) And, as he previously testified, he explained that Pruitt's subsequent cardiac tests were all negative. (*Id.*) ME Stevens did not find any evidence of a stroke in the record, nor did he find any evidence of back impairments. (R. 55, 79.)

ME Stevens did not testify regarding Pruitt's mental impairments, stating such topics were beyond his professional purview. (R. 54.)

D.   **Claimant's Testimony**

11

Pruitt appeared at the hearing and testified as follows in response to questions posed by his attorney and the ALJ. At the time of the hearing, he was 46 years old. (R. 65.) He stood 5'7" tall and weighed 225 pounds. (*Id.*) He is right handed. (R. 66.)

Pruitt lives in the basement of a house with his sister and his niece. (R. 66.) He is divorced and has two adult children. (*Id.*) He holds a valid driver's license and drives once a month, usually to the pharmacy for medication. (R. 66-67.)

Pruitt often has trouble breathing, especially when it is very hot or cold outside. (R. 63.) Pruitt sleeps in a recliner with his legs and head elevated because he finds it difficult to breathe when he tries to sleep in his bed. (R. 57-58.) He usually sleeps for four hours a night. (R. 58.) He is exhausted all the time. (R. 65.)

Pruitt also suffers from back pain between his shoulder blades, for which he uses a heating pad. (R. 59, 77.) Because of this pain, Pruitt cannot lift his arm over his head regularly or lift objects such as a gallon of milk. (*Id.*) His back pain has gotten worse since his last MRI, but he has been unable to afford further treatment. (R. 62-63.) Pruitt denied any problems with his hands. (R. 77.)

Pruitt testified that he feels depressed and hopeless all the time and has difficulty dealing with every day life. (R. 56.) He often has trouble concentrating. (*Id.*) He also suffers from anger management issues and is easily irritated. (R. 57.) He has contemplated suicide. (R. 59-60.) Pruitt has a few friends, but generally does not like being around other people. (R. 60.)

Pruitt brought his medications to the hearing. He testified that the nitroglycerine rarely alleviates his chest and back pain. (R. 69.) He uses albuterol regularly, but

stated that it only relieves his wheezing and does not relieve his shortness of breath. (R. 68.) He uses a nebulizer once every two weeks. (*Id.*) Pruitt stopped taking medication for depression due to the side effects and because, in his view, it never really helped. (R. 70-71.) He also testified that he was no longer visiting Aunt Martha's for therapy. (R. 70.) Pruitt denied any alcohol abuse and testified that he stopped smoking cigarettes a few years ago. (R. 73-74.)

As for daily activities, Pruitt spends most of his time watching television or listening to the radio. (R. 71.) Pruitt can dress himself, but has difficulty taking showers and shaving because it is hard to stand up. (*Id.*) He does not read the newspaper because he has trouble reading. (R. 63, 72.) He also has trouble writing and filling out job applications. (R. 63, 73.) He does do his own laundry, but does not do any other household chores. (R. 72.) He does not go shopping because he gets too tired. (R. 77.)

Pruitt last worked as a foreman at an irrigation company. (R. 75.) Prior to that he worked as a building maintenance laborer. (R. 76.) In that position, he was required to lift forty pounds. (*Id.*) Pruitt was offered a job with an irrigation company, but was unable to work out in the sun due to his breathing problems. (R. 78.)

**E.    Vocational Expert's Testimony**

Vocational Expert ("VE") James Breen also testified at the hearing. VE Breen first explained that although Pruitt's past position as a building maintenance laborer is classified at the heavy exertional level, Pruitt performed it at the medium exertional level. (R. 81.)

13

Next, the ALJ asked the VE to consider a hypothetical individual of claimant's age, education, and work experience, that maintained the work capabilities outlined by ME Stevens, namely a sedentary level of exertion; no climbing of ladders, ropes, or scaffolds; occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching, and crawling; and no exposure to cold, heat, wetness, humidity, or irritants. (R. 81-82.) The hypothetical individual is moderately limited in his activities of daily living, social functioning, and concentration, persistence, and pace. (R. 82.) The individual is limited to work involving one or two-step tasks with verbal instructions that do not require complex, written, or verbal communication. (*Id.*) The individual would be further limited to only occasional interaction with public, coworkers, and supervisors. (*Id.*) When asked if such a hypothetical individual could perform claimant's past work, the VE responded in the negative, explaining that the past work was above the sedentary level of exertion. (R. 83.) However, he testified that the individual could perform other unskilled, sedentary, assembly type work, such as eyeglass assembler, printed circuit board assembler, and sorter. (R. 84.)

Next, the ALJ further limited the individual described above to only occasional bilateral overhead reaching; no interaction with the public and only brief and superficial interaction with coworkers (less than 15% of the workday); and no tandem tasks. (R. 85.) The VE testified that the individual could still perform the jobs previously identified. (R. 86-87.)

The VE then asked whether that same individual could work if he were off task more than 20% of the workday due to pain. (R. 87.) The VE testified that the individual would be precluded from work because employers usually tolerate employees to be off

14

task only 10% of the day. (*Id.*) He explained that employers allow routine fifteen minute breaks in the morning and afternoon, and a thirty to sixty minute lunch break. (*Id.*) He further testified that employers generally permit ten to twelve absences per year. (*Id.*)

Lastly, the VE confirmed that other than the information regarding customary break and absence time, which was based on his experience in the vocational rehabilitation field, his testimony was in accordance with the Dictionary of Occupational Titles. (R. 88.)

## II. LEGAL ANALYSIS

### A. Standard of Review

The Court must affirm the ALJ's decision if it is supported by substantial evidence and free from legal error. 42 U.S.C. §405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Evidence is substantial when "a reasonable mind might accept [it] as adequate to support a conclusion." *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004). We must not "re-weigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner," but we must consider the entire administrative record. *Clifford v. Apfel*, 227 F.2d 863, 869 (7th Cir. 2000). The ALJ must form a logical bridge between the evidence and her assessment, but she need not discuss every piece of evidence in the record. *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).

### B. Analysis under the Social Security Act

In order to qualify for DIB or SSI, a claimant must be "disabled" under the Act. A

person is disabled under the Act if "he or she has an inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than twelve months." 42. U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The ALJ must consider the following five-step evaluation to determine whether the claimant is disabled: "(1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether he can perform past relevant work, and (5) whether the claimant is capable of performing any work in the national economy." *Dixon*, 270 F.3d at 1176. The claimant has the burden of establishing a disability at steps one through four, and at step five the burden shifts to the Commissioner. *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).

ALJ Cromer applied this five-step analysis. At step one, she determined that Pruitt has not engaged in substantial gainful activity since April 30, 2006, the alleged onset date. (R. 31.) At step two, the ALJ found Pruitt suffers from the following severe impairments: back pain, COPD, asthma, leg edema with unknown etiology, obesity, and depression/bipolar disorder. (R. 32.) The ALJ did not find claimant's alleged coronary artery disease to be a severe impairment. (*Id.*) Next, the ALJ concluded that Pruitt does not have an impairment or combination of impairments that meets or medically equals the listed impairments in 20 C.F.R. Part 404, Subpart P, App. 1. (R. 32-34.)

The ALJ went on to assess Pruitt's RFC and determined that he can perform

16

sedentary work as defined in 20 C.F.R. 404.1567(a) and 416.967(a)[3] with no climbing of ladders, ropes, or scaffolds; no more than occasional balancing, stooping, kneeling, crouching, crawling, climbing of ramps or stairs; no more than bilateral overhead reaching; and with no exposure to cold, heat, wetness, humidity, and pulmonary irritants. (R. 34.) ALJ Cromer further limited Pruitt to work that involved simple one to two step tasks with verbal instructions; "average paced work," free of fast paced production, such as assembly line work; no contact with the public and only brief (no more than 10-15% of the workday) and superficial contact with co-workers and supervisors and with no tandem tasks with co-workers. (Id.) Lastly, the ALJ concluded that the work should not involve complex written or verbal communications. (Id.)

Based on this RFC, the ALJ determined, at step four, that Pruitt cannot perform his past relevant work as a building maintenance laborer. (R. 38.) However, at step five, the ALJ concluded that Pruitt can work in other positions in the national economy, including eyeglass assembler, print circuit assembler, and sorter. (R. 39.) As a result, the ALJ entered a finding of not disabled. (Id.)

Pruitt now argues, quite cursorily, that the ALJ committed reversible error when she found his coronary artery disease to be a non-severe impairment.

## C. The ALJ's Decision is Supported by Substantial Evidence and Free

---

[3] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. §§ 404.1567(a), 416.967(a).

**From Legal Error.**

As mentioned above, ALJ Cromer found that Pruitt suffered from the following severe impairments: back pain, COPD, asthma, leg edema with unknown etiology, obesity, and depression/bipolar disorder. However, she determined that Pruitt's alleged coronary artery disease was not a severe impairment. In doing so, she relied on the ME's testimony that "the claimant's alleged coronary artery disease is not developed in the record" and that there is "no objective evidence of neurovascular disease associated with [his] leg edema." (R. 32.) And, although the ALJ recognized Pruitt's abnormal EKG back in 2007, she pointed out that more recent EKG results were normal. We find no reversible error in the ALJ's conclusion at step two.

At step two, the ALJ is required to determine whether the claimant has an impairment or combination of impairments that is "severe," 20 C.F.R. § 404.1520(a)(4)(ii), such that it "significantly limits [one's] physical or mental ability to do basic work activities," *Id.* at § 404.1520(c). The Seventh Circuit has made clear that step two of the ALJ's analysis is "merely a threshold requirement." *Castile v. Astrue*, 617 F.3d 923, 927 (7th Cir. 2010) (*quoting Hickman v. Apfel*, 187 F.3d 683, 688 (7th Cir. 1999)). "As long as the ALJ determines that the claimant has one severe impairment, the ALJ will proceed to the remaining steps of the evaluation process." *Castille*, 617 F.3d at 926-27. Thus, "the determination of whether a particular impairment is severe or not is of no consequence to the outcome of the case where...the ALJ recognized other severe impairments and so proceeded with the full evaluation process." *Willis v. Astrue*, 10-207-CJP, 2011 WL 2607042, at *9 (S.D. Ill.

July 1, 2011); *see also Boucek v. Astrue*, No. 08 C 5152, 2010 WL 2491362, at *14-15

(N.D. III. June 16, 2010) ("where ALJ finds claimant suffers from severe impairments,

failure to find other condition constituted a severe impairment could not constitute

reversible error") (citation omitted).

Here, where the ALJ found other impairments to be severe at step two, the ALJ's

decision not to treat the alleged coronary artery disease as a severe impairment does

not warrant reversal. Further, it is the claimant's burden to prove that his impairments

are severe. *Boucek*, 2010 WL 2491362, at *5 (*citing Clifford v. Apfel*, 227 F.3d at 868).

Pruitt has failed to cite to any evidence in the record supporting his assertion that he

suffers from severely limiting coronary artery disease. In fact, as both the ALJ and the

ME noted, and as outlined above, the treatment records indicate that cardiac testing

repeatedly yielded normal results. Based on those results, a number of physicians

declined to attribute Pruitt's complaints of chest pain and shortness of breath to any

cardiac abnormalities.

In any event, notwithstanding the ALJ's decision at step two, the ALJ is of course

required to consider all of claimant's impairments, both severe and non-severe, in the

subsequent stages of her analysis. *See Amey v. Astrue*, No. 09 C 2712, 2012 WL

366522, at *6 (N.D. III. Feb. 2, 2012) (*citing Golembiewski v. Barnhart*, 322 F.3d 912,

918 (7th Cir. 2003)). To the extent that claimant is arguing that the ALJ failed to

properly account for his chest pain and shortness of breath, whether it be attributed to

COPD or cardiac problems, we would again disagree.

In assessing a claimant's RFC, which is "the maximum that a claimant can still

do despite his mental and physical limitations," the ALJ must consider the medical

19

evidence in the record and all other relevant evidence, including the claimant's testimony regarding his impairments. *Craft v. Astrue*, 539 F.3d 668, 675-76 (7th Cir. 2008). "The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." Social Security Ruling ("SSR"), 96-8p, 1996 WL 374184, at *7.

Here, the ALJ properly considered the medical evidence before her, the claimant's testimony, and the opinions of various physicians. In evaluating the claimant's testimony regarding his symptoms, including his chest pain and shortness of breath, the ALJ reviewed a number of the factors set forth in SSR 96-7p, such as his daily activities, the nature of his pain, and his treatment regimen. *See* 1996 WL 374186, at *3 (setting forth factors to consider in assessing a claimant's credibility). The ALJ also explained the weight she afforded each medical opinion and provided sufficient reasons for the opinions she discounted, including that of Pruitt's treating physician. *See* 20 C.F.R. § 404.1527(c)(2) (indicating that the ALJ must always give "good reasons" for her determination as to the amount of weight afforded a treating physician).

Further, Pruitt has not cited to any evidence in the record, other than his own subjective complaints, which indicate that his chest pain or shortness of breath cause further functional limitations than those found by the ALJ. Nor has Pruitt pointed to any specific errors in the ALJ's sequential analysis that require reversal. Having reviewed the record and the ALJ's decision, we conclude that the decision is supported by substantial evidence and free from legal error.

## III. CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment [12] is denied, the Commissioner's motion for summary judgment [19] is granted, and the Commissioner's previous decision to deny benefits is affirmed. It is so ordered.

**ENTERED:**

MICHAEL T. MASON
United States Magistrate Judge

**Dated:** **December 23, 2013**